Kevin M. Bagley for Appellant Angstrom, Lipscomb & Lack. Each side has 15 minutes, and that includes your rebuttal time. Thank you, Your Honor. Kevin M. Bagley, attorney for Angstrom, Lipscomb & Lack. The appellants in this case. The appellants are contesting the tax court's methodology of computing the allowed deductions as well as its treatment of payments that were made by one of the shareholders on its behalf. This case involves Angstrom's use of a G-4 Gulfstream and a King Air turbojet in connection with its business from 2007 to 2010, the years in issue. The tax court determined that 84 of 119 flights that it listed on an exhibit, on an appendix to its opinion, met the substantiation requirements and were entitled to deductions. Well, your theory of the case seems to be that G&L Aviation had an agreement stating that in return for 24-hour access to the aircraft, Angstrom would pay a portion of G&L's aviation operating expenses. What specific evidence in the record directly supports this position? Testimony of Mr. Lack, testimony of Mr. Girardi. Did Mr. Lack say there was an agreement between Angstrom and the partnership? I didn't see that. Can you point me to where? I don't know that there's a specific, that he testified specifically that there was an agreement, but there's a history from 1993 that that's exactly what these law firms did. But there's no written agreement, and there's no testimony that an agreement existed. Is that correct? I would have to go. I don't see anything in the. . . I think that the testimony is susceptible of saying, yes, there was an agreement, because on cross-examination by the government, Mr. Lack testified that he would decide how much cash needed to go into G&L to pay the sums, and he would talk about that with Tom, and they would pay the amount necessary for G&L to meet its cash needs. Well, now, the tax court based its decision on lack of substantiation. Is that correct? A part of it, yes, Your Honor. Well, did they say that, was there a conclusion by the tax court that the expenses were not ordinary or necessary? I didn't see that. Well, no, the tax court didn't go there, because the. . . Okay, so that's not part of the conclusion. So it's basically lack of substantiation, right? Yes, it is. It's lack of substantiation, but the way that it went about computing the deductions. . . Okay, so if it's lack of substantiation and it's looking at the deductions, then you have the burden on that, right? Correct. Okay, and so you're taking fault with some of the things of the way that the tax court looked at things and did that, but any time you have the burden and lack of substantiation, sometimes that instance requires some sort of deference to the trier of fact, and there were a couple of things that I believe that the tax court noted or that was in the record. The things, there was not contemporaneously made records, and so that was one thing that the tax court looked at, and then I think Stingstrom also made a concession that they should not have claimed its payments for the use of the luxury suite as travel expenses. So the tax court can kind of factor all of that into looking at the other evidence you present, right? The tax court can. The tax court, however, ignored the principal argument that we made, which was that there was this implicit agreement between the major. Well, but the tax court would have been free not to believe that, right? There's not a written agreement, right? We started that. Let's assume there was no written agreement. All right, but that doesn't end the inquiry because you don't have to have a written agreement, but the tax court could have looked at the evidence that there wasn't an implied or an understanding based on, I think, Judge Acuda said, well, where in the record do you have that Lacks said that there was an agreement? You know, then I pointed out these other things where what they ultimately presented didn't appear to be contemporaneously made. They came up with something before trial, and then also they conceded that the luxury box wasn't. You know, when you put all of those together, why was the tax court wrong that the substantiation wasn't enough? That's not our contention on appeal. What is your contention, then? Our contention on appeal is, first, that no substantiation of business purpose in this case is required. The arrangement that was conducted, that was testified to, was that Lack and Gerardian, or Engstrom and Gerardian-Keese,  would supply G&L Aviation. Yes, and what's your best case out there where it's not a written agreement and there aren't contemporaneous records, that just because someone comes and testifies that there's no other conclusion that a trier can reach than that they're substantiated? That's what you're saying, right? Well, no. But I just heard, so tell me why I misheard. Well, if you let me finish the argument, I'll tell you the argument. And the argument is that, as a matter of fact, during these four years, Engstrom and Gerardian-Keese paid all the money that G&L needed to operate, except for the $7 million of the revenue that had generated totally independent of those payments. And we have cases where Mr. Lack or Engstrom showed that Mr. Lack used the aircraft 13 times for private business and he used it once for purely personal purposes. But that was use that he did as a general partner, not as an employee of Engstrom. Engstrom and Gerardian-Keese were only paying for business use. G&L Aviation and the owners stood to absorb the costs for the flights that were made on behalf of the private business of the general partners, as well as the personal flights. And it's not Engstrom that should be responsible for determining which flights are personal and which are business when you have a situation where the partners can use the $7 million of other assets to fly their planes on behalf of their private business and even do it personally. But if they do it personally, it's not Engstrom that should pay the price, it's G&L. And G&L was not the audit target in this case. But that's the principal argument that we're making, is that all that Engstrom was paying for was for business use. And that any other use by Mr. Lack, the use that was identified by the tax court, was used by G&L, the general partners of G&L. And that goes to the next issue, which was the treatment of the amounts that were paid by Mr. Lack to G&L directly. The tax court said, no, no, no, he wasn't paying Engstrom's expense. These were not reimbursable expenses. These were paid for his personal obligations. So Lack, if I remember this correctly, Lack had some obligation as a member of the partnership, the G&L partnership, to pay for 50% of the cost. Is that right? Well, as a general partner, you have a 50% liability to make a contribution. And my understanding was that Engstrom paid everything that Lack paid. Is that right? So Engstrom ended up either paying directly to G&L or reimbursing Lack in an amount that was equivalent to whatever Lack's responsibility was under the partnership. Is that wrong? That's wrong, because what happened was that Girardi and the partners of G&L, during this four-year period, they made a capital contribution of $650,000. And other than that, they didn't make any contributions to the operating expenses of G&L. But G&L, again, had $7 million of cash that it generated from other sources. And the law firm said, okay, we want to use these planes and we'll pay the balance. And the law firms used the planes much like an owner would use the planes. And so we look at the Palo Alto town and country case that the tax court never even analyzed, and you have exactly the same situation, not exactly, but you have the same situation where you have several controlled companies, one of which owns an airplane, and the others say, okay, we will pay all of their operating expenses. So was Engstrom was paying for 50% of G&L's operating expenses? No, it was not. What percent was it paying? That was an arrangement between Engstrom and Girardi and Keyes. They decided between themselves how much they would put in. I thought Lack and Girardi and Keyes were the partners of G&L, not Engstrom. They are. They are, but in making payments, the amounts that were going to be made between G&L and, I mean, they decided between themselves who was going to pay what. And during this four-year period, Girardi paid $7 million, and Engstrom either paid 1.7 if you don't allow the $2.5 million that Engstrom paid. How much did Lack pay? Did he pay anything as a partner in G&L? As a partner? Well, according to the no, like I said, there was capital contributions that were made to G&L. Neither Girardi or Lack made any payments for use of any of the partnership assets. So no, they didn't make payments for their partnership obligations. Rather, they arranged with Engstrom and Girardi and Keyes to pay those excess operating expenses in exchange for use. But did Lack pay anything for his personal use of the planes or use of the Staples Center suite? Well, the Staples Center is just not a part of the case. And, yes, Engstrom did pay for that. No, I was asking about Lack. Well, Lack, I have no information that I can discuss about the Staples suite. That was a concession, and I'm not prepared to talk about whether all those expenses that were paid by Engstrom, that none of them were personal for Mr. Lack. But, no, as far as I know, well, I shouldn't even go there. Mr. Lack may have paid something for that. But they would have paid it to Engstrom, I believe. Did Lack pay for any costs for his use of the planes, for his personal use? No, he did not. But he did pay tax on the $6 million of revenue that G&L earned from other sources. And he paid tax on 50% of the money that was paid by Girardi and Keese, as well as by him. And in the tax court's ruling with respect to his $2.5 million, he's still going to pay tax on half of that. And there was, in the course of history of the partnership, and certainly for these four years, the general partners never made any contributions to the partnership except the $650,000. And our position is that as owners of the partnership, they're entitled to use the planes. So the tax court, let's assume the tax court didn't believe that there was an agreement that Engstrom would pay for, I guess, whatever the amount was of operating costs to have a standby flight. So it didn't agree with that. And there wasn't any actual written agreement or specific testimony as to an agreement. Does that just mean you lose, then, if that's your argument? No, it doesn't mean we lose at all, because the facts are the facts. The partners didn't put in any money except the $650,000 capital contribution. The partnership did borrow some money. It borrowed $1 million. But it paid all its expenses. It didn't have much cash left in the bank each year, but it paid all its expenses. So the only source for the money is Engstrom and Girardi and Keyes. So if the tax court didn't believe that there was an agreement to pay for a standby, then the tax court said then they can only deduct actual travel, business-related travel expenses, which is exactly what the tax court did, right? Well, no. What the tax court did was it said, okay, we've got 84 flights that we say are good. We've got 119 flights that we say are bad. And we're going to apply, and we're not going to allocate that cost. We're not going to allocate it at all. We're going to pick that number out of the single line of testimony about what the charter rates were, and we're going to multiply that times flight hours. And I should remind the court that the commissioner had the burden of proving whether the expenses were reasonable or not. And it's a leap to say, okay, there was no agreement, so we're going to decide that anything that wasn't allowed as a ---- But my understanding was that that wasn't at issue here, that, yes, the commissioner does have the burden on whether the expenses are ordinary and necessary. But my understanding is where this case went was on the substantiation, that no one said that they weren't ordinary and necessary. That's accepted here, but it's on the substantiation. And when you get to the substantiation, that burden shifts to you. Well, I disagree with that. How could the court possibly get from $4.2 million in deductions to $900,000 to, I guess, a million three, if you're taking everything into account, how did it get there? How did it use the charter rates to determine the amount of the deduction? That was the predicate in Palo Alto where this court said, hey, having a cost-sharing arrangement is fine, and the court's contrary determination to the tax court's contrary is clearly erroneous, and we're setting it aside. So when you have a ---- All right, we're actually a minute over your time. Unless the panel has any other questions, that concludes your time. I will give you two minutes for rebuttal, but you're actually a minute over at this point. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors. I'm Richard Calderoni on behalf of the Commissioner of Internal Revenue, and may it please the Court, the tax court in this case addressed Engstrom's claims to deduct his travel expenses, both amounts that it paid to G&L Aviation and amounts that Walter Locke paid to G&L Aviation. And to answer Judge Yakuta's question, there were payments from both Engstrom and Locke to G&L in every year from 2007 to 2010. And Locke eventually caused Engstrom to repay him the amounts that he paid to G&L in 07 and 08. He never caused Engstrom to repay him the amounts that he paid to G&L in 2009 and in 2010. Did he claim that those were loans also in 2009 and 2010? Yes, Your Honor. He claimed that all four payments that he made in these years to G&L were loans to Engstrom. And on that basis, he made clear in his testimony that Engstrom was claiming deductions for every penny that he paid to G&L during these years. And there was no evidence of a written or any other kind of agreement between Engstrom and G&L under which the firm would agree to pay a share of G&L's operating expenses. What we have in the record as Exhibit 7 is an agreement between Locke and Girardi as partners of G&L that they would split the operating expenses. And there's also testimony in the record that, you know, they had a rough agreement to split those expenses 50-50. But Locke said, and this is at Supplemental Excerpts of Record 23, as well as pages 62 to 63 and 77 of Appellant's Excerpts of Record, that it was his unilateral decision to determine how much money he would personally put into G&L and how much money that Engstrom would put into G&L. So there's no evidence at all that Engstrom was paying for standby use of aircraft or any other particular expense. Let me ask you this. And I was trying to sort of get to that. All right. If it's an ordinary and necessary issue, that's the commissioner's burden, correct? That's correct. And if it's a substantiation issue, that would then be the appellant's burden. Yes, that's correct. Did the tax court – are the tax courts finding based on lack of substantiation or a conclusion that expenses were not ordinary and necessary or both? It's both, Your Honor. As to the payments that Locke made to G&L, the tax court concluded that these were not business expenses under Section 162A to Engstrom because they were payments that Locke made under his own obligations and they weren't loans to the firm. As to all of the amounts that Engstrom sought to deduct that it paid to G&L, the tax court's determinations were based on the substantiation requirements of Section 274D. So when Engstrom talks about the tax court's apportionment of the amounts that it paid to G&L between permissible and impermissible deductions, that's a Section 274 issue, and it's one on which Engstrom – yes, on which Engstrom bore the burden of proof. So opposing counsel, as I was reading his brief, it had sort of a race-ipsiloquiter argument. It was, why would Engstrom make these payments to the partnership unless it was for use of the planes on a standby basis? Well, Your Honor, I can't speak to why Mr. Locke had Engstrom make these payments. What I can say is – Was Locke in control? He was a 50 percent owner, but did he have decision-making authority over Engstrom? He said on excerpts of Record 77 that it was 100 percent his decision how much Engstrom paid G&L. Yes, Your Honor. And Engstrom has also put forward several arguments in an attempt to show that it didn't have to meet the substantiation requirements of Section 274, but the regulatory exception for situations in which the business purpose of the travel is otherwise clear doesn't apply here, and this also goes, I think, kind of to Engstrom's race-ipsiloquiter argument, because it's claiming deductions for every cent that either it or Locke paid to G&L, and yet it has conceded that Locke used G&L aircraft for purposes other than Engstrom business. And in addition, if you look at the reconstructed flight log that Engstrom introduced through Locke at trial to support its claim that it had substantiated the business purpose of its travel, a large number of those flights list only Mr. Girardi, who had no direct connection with Engstrom as a passenger. Well, now, just so that I understand the evidence, were there contemporaneous records or were these records that were introduced prepared after? There are both kinds of records, Your Honor, but Engstrom conceded in the tax court that the contemporaneous records did not satisfy the business purpose requirement, the substantiation provisions of Section 274D. So to the extent that they can substantiate the business purpose of any travel, that is only through this after-the-fact reconstructed flight log that was brought in through Mr. Locke at trial. Engstrom has also argued, principally in its reply brief, that that reconstructed flight log is not actually a list of flights through which it is claiming deductions, but the log itself has a header at each page that states that it represents Engstrom, Lipscomb, and Locke's use of a particular airplane in a particular year. Mr. Locke testified at trial that these were principally his flights and that he had personal knowledge of most of the travel, and Engstrom's counsel indicated to the tax court that this document was being introduced to substantiate the business purpose of Engstrom's travel. Well, I like to think of things, I always like to think of the burden of proof because that's obviously so important in appellate cases. Let's say on the substantiation issue, if you had lost based on the evidence that was presented, would you lose on appeal? If the tax court had looked at, you know, there's obviously, if there's more than one way to look at evidence on substantiation, is it possible that based on what the tax court did that either of you could lose based on the burden of proof? Insofar as the tax court held that the business purpose of flights was not substantiated, Your Honor, no, I don't think so. There's no evidence at all that any additional flights had a business purpose for Engstrom. The tax court looked through all of the flights on which Mr. Locke was identified as a passenger that were on the reconstructed flight log, and it very carefully went through the record and determined that a number of those flights had a connection to Engstrom's business and a number of them did not. And as I read Engstrom's brief... But Mr. Engstrom took exception with that and said, well, I had an agreement, right? Your Honor, I don't believe that Engstrom has argued that Locke had a business purpose for any of the additional flights. It has said the tax court... They certainly haven't conceded the issue. They haven't conceded the issue, Your Honor, but my view of their approach is that they have said that the tax court shouldn't have taken this granular view. It should have instead said, well, our overall costs were reasonable. Well, do you understand what I'm saying? There's some cases that if there's deference owed to the fact finder and how they look at evidence, even though one side or the other, they don't agree with it, there's some cases when you come on an appeal that the standard of review is going to determine who wins. And I think it could have worked that way for you had you lost here. Your Honor, we would disagree with that. In our view, there is no evidence that any other flight that Engstrom took had a business purpose. Well, let's say that there had been a written agreement in the record that said, between Engstrom and the partnership, Engstrom saying it's useful to us to have planes on standby and therefore we will pay 50% of the operating costs. Would that have gotten appellant where it wants to be? On the substantiation issue, Your Honor, probably not, because that would get appellant through the Section 162 Ordinary and Necessary Business Expense Hoop, but the Section 274D substantiation requirements would still apply. And in that regard, I think it's important to note that this Court's decision in Palo Alto didn't have occasion to apply the substantiation provisions of 274. Well, but they would certainly have a better argument with a written agreement, wouldn't they? They would certainly have a better argument. Because, I mean, you know, I don't think it helps your purpose sometimes to take – when everyone, like, takes the far extremes, I mean, a lot of times what we have isn't – you know, if there were a written agreement, they would have a better argument here. Your Honor, I agree that they would have a very strong argument under Section 162A. They would also have a good argument under 274 that at least some of their travel was for a business purpose. But we have a record in which Engstrom has affirmatively conceded that some of the expenses for which it was paying deductions involved travel that had nothing to do with Engstrom's business. But if they agreed to pay half the operating costs, and they say, and you may use the planes when we don't need them, why would they have to justify every single flight? They just have to justify their – that it was reasonable for them to pay for half of the operating costs in order to have the standby capacity. I don't see why you would even get to looking at the individual flights and their purposes if you believe that it was an ordinary and necessary expense to have the standby capacity. That's what Palo Alto seems to say. Well, Your Honor, I don't think Palo Alto says that because I don't think the substantiation issue was raised in Palo Alto by either side. Doesn't the written agreement substantiate the business expense? I mean, it says that that's all you need. Your Honor, if the agreement contained all of the terms that you just specified, it might get appellant there, yes. But, of course, that's not what we have in this case. Right, you don't have – did anyone testify that there was – specifically testify that there was an agreement between Engstrom and the partnership about standby use? Not about standby use or anything else, Your Honor, no. Okay, thank you. If the Court has no further questions, I will finish there. We don't appear to. Thank you very much, Your Honor. All right, you have two minutes. Thank you. First of all, counsel said that – on the hypothetical that if there was an agreement that – a written agreement that Engstrom would pay 50 percent of the costs in order to have use of the airplane, did that mean that we'd have a better argument? He conceded, yeah, you'd have a better argument, but you'd still have to identify which flights were – He only conceded it after a little pounding here. That's true. Which flights were for business and which needed 274. That's just not the case. If you are paying for business in this – under these fact situations, because the guy that is making decisions about the flights of Engstrom and the guy that is making the decisions for using the plane as a general partner is the same guy. So how can you – if they're going to have an agreement – if they're going to have a situation where Engstrom is paying for these flights and Lack can use the planes any way he wants as a general partner, then why do we have to substantiate the business expense, the business nature of the use? Now, having said that, if you accept that somehow there's going to have to be an allocation of the expenses, then you have to start with the entire deduction, because there was no finding that the expenses claimed by the – by Engstrom were unreasonable. And again, the tax court went from $4 million in deductions to $9 billion in deductions, partly by 274, but mostly by applying these fixed rates. And I don't see – in Palo Alto, the tax court used fixed rates because it made a specific finding that the expenses claimed were unreasonable. Here, there's no discussion of the reasonability. And there's absolutely nothing in Section 274 that says, in absence of any other evidence, we'll use charter rates to determine the reasonable deductions for using aircraft. There's simply nothing like that. Unless there's additional questions, you've exceeded the time – the additional time that I've given you. Thank you very much, Your Honor. Thank you both. This matter stands submitted and the court will be in recess until tomorrow morning. Thank you. All rise.
judges: Callahan, Bea, Ikuta